UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RAYMOND JENNINGS,

               Plaintiff,                        Case No. 12-12227
                                                  Honorable Thomas L. Ludington

v.

DOW CORNING CORPORATION,

               Defendant.

_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

"Because the ADA imposes extensive requirements on employers and covers a broad range of conditions, new puzzles seem to arise from every case." *Taylor v. Pathmark Stores, Inc.*, 177 F.3d 180, 192 (3d Cir. 1999). The court in *Taylor* happened upon an unquestionable truth. And this case, involving claims under the American with Disabilities Act (ADA), demonstrates a number of those puzzles.

Plaintiff Raymond Jennings is a remarkable gentleman. He has gone to great lengths to provide for his family, and he maintains a healthy lifestyle. Plaintiff is a competitive triathlete, and when he is not hoisting himself into trees as a part of his full-time occupation as an arborist, he works a part-time job to ensure his family is provided for. When Plaintiff decided to pursue employment in the emergency-response field, he volunteered with his local fire department for three full years to learn the skills necessary for the job.

But despite Plaintiff's credentials, he applied for a job with Defendant Dow Corning that he cannot fulfill. Because he is not "otherwise qualified" under the ADA for the position he

sought with Defendant, Plaintiff's ADA claims are untenable.  Defendant's motion for summary judgment will be granted, while Plaintiff's motion for summary judgment will be denied.

**I**

For the most part, the relevant facts of this case are not in dispute.  This is likely why both parties have moved for summary judgment, contending that when the law is applied to those facts, they should each prevail.

**A**

In June 2011, Defendant extended a conditional offer of employment to Plaintiff for a Loss Prevention Officer (LPO) position at its Midland Chemical Plant.  The Midland Plant is a chemical manufacturing facility, employing toxic materials in chemical processes that generate extreme heat and pressure.  Given the inherent risks these processes create, "[s]afety is [Defendant's] paramount concern."  Stokes Aff. ¶ 3, *attached as* Def.'s Mot. Ex. 4.  Accordingly, Defendant employs LPOs to ensure the safety and security of the Midland Chemical Plant and the employees who work there.

The job responsibilities of an LPO include, among other things, responding to emergencies (such as fires and chemical spills), effectively using emergency response equipment, providing emergency medical care for injured or ill personnel, performing confined space entries, and coordinating rescue operations.  *Id*. at ¶ 8(a)–(c).  Elizabeth Stokes, the Human Resources Manager at Defendant's Midland Plant, established as follows:

> The inability of a Loss Prevention Officer to perform the essential functions of the position just one time would greatly endanger the safety of the Loss Prevention Officer and other Dow Corning employees.  Failure to perform the job's essential functions just once could also have catastrophic consequences, including death and creating millions of dollars in economic damage and potential liability.

*Id*. at ¶ 4.

Given the necessity that LPOs are physically capable of performing during emergencies, Plaintiff's offer of employment was contingent upon his successful completion of a pre-employment medical evaluation.  Plaintiff's evaluation was conducted and supervised by Dr. Sushil Mankani, M.D., a board-certified occupational medicine physician and Medical Director of Defendant's Employee Health Services Department.  The evaluation began on June 17, 2011 with a medical history and physical examination.

Rebecca Chronowski, a certified Physician's Assistant working under Dr. Mankani's supervision, conducted Plaintiff's physical examination.  Testing revealed that Plaintiff's range of motion, grip strength, functional tests, and lifting capabilities were within acceptable ranges. Plaintiff's vision, hearing, and cardiac health were also examined.  After conducting Plaintiff's physical evaluation, Chronowski prepared a short report of her impressions.  She noted Plaintiff's "[c]hronic low back pain appears to be ongoing," which she attributed to his position as an arborist, but established that she was "leaning towards no restrictions for the LPO job." Pl.'s Mot. Ex. 7, at 2.

In completing his medical history questionnaire, Plaintiff indicated that in 2010 he underwent surgery to repair a torn rotator cuff and a torn labrum in his left shoulder.  He also indicated that he intermittently experienced neck, back, or shoulder pain lasting more than three days, had previous work restrictions that lasted longer than three days, and had lost time from work due to injury.  In a written explanation, Plaintiff indicated he consults with a chiropractor twice a month to remedy ongoing pain in his hips, ribs, back, and neck.  In an OSHA Medical Exam Questionnaire completed the same day, Plaintiff established that he was currently experiencing back pain.

Based on Plaintiff's reported chronic back pain and history of shoulder injuries, Defendant obtained the medical records from the providers that treated Plaintiff for those problems. Dr. Mankani then reviewed the records as a part of Plaintiff's overall evaluation.

**B**

Plaintiff's chiropractic records revealed that in March 2005, he sought chiropractic treatment for neck and left shoulder pain. Def.'s Mot. Ex. 5–A, at 162. He reported the pain was "constant," and interfered with his ability to function normally. *Id*. The records also revealed that from 2005 through the time of his medical exam in 2011, Plaintiff continued to experience ongoing, chronic pain in his back, neck, hips, and shoulders. Examples of Plaintiff's complaints during this period[1] include:

- On January 31, 2009, Plaintiff rated his neck and mid back pain at 7 out of 10. He rated his right shoulder pain as 6 of 10. *Id*. at 160.

- On February 2 and 3, 2009, Plaintiff reported that the pain in his right shoulder, neck, and mid back was 7 of 10. *Id*. at 156, 158. On February 4, 5, and 6, Plaintiff rated his right shoulder, neck, and mid back pain as 5 out of 10. *Id*. at 150, 152, 154.

- On February 24, 2009, Plaintiff indicated his neck and mid back pain was 4 out of 10. *Id*. at 147.

- On March 11, 2009, Plaintiff was experiencing neck pain at a level of 5 out of 10, with mid back pain at 4 of 10. *Id*. at 143.

- On April 2, 2009, Plaintiff rated his neck pain as 6 of 10 and his low back pain as 5 of 10, while his mid back pain had risen to 8 out of 10. *Id*. at 141.

- On May 6, 2009, Plaintiff reported his neck, mid back, and low back pain as 5 out of 10. *Id*. at 139. On May 20, Plaintiff's neck and mid back pain had risen to 7 out of 10. *Id*. at 137.

---

[1] Plaintiff's chiropractor did not provide Dr. Mankani's office with records of Plaintiff's treatment from July 10, 2005 through 2008. Accordingly, whatever complaints are contained in those records, if any, were not included in Dr. Mankani's analysis, and will not be discussed here.

- On June 3, 2009, Plaintiff reported neck and mid back pain at a level of 8 out of 10.  *Id*. at 135.  His low back pain was a 6.  *Id*.

- Between August 3 and August 6, 2009, Plaintiff complained of severe low back pain between 8 and 10 out of 10.  *Id*. at 127, 129, 131, 133.  The next day, Plaintiff reported his low back, neck, and right shoulder pain as 6 out of 10.  *Id*. at 125.  His low back pain remained at 5 or higher during his remaining appointments in August 2009.  *See id*. at 121, 123.

- On September 4, 2009, Plaintiff rated his neck and mid back pain as 6 out of 10.  *Id*. at 119.  Two weeks later, Plaintiff's neck pain was still 6 of 10, and his right shoulder and mid back pain were 4 of 10.  *Id*. at 117.

- On May 22 and 24, 2010, Plaintiff complained that the pain in his right shoulder, neck, and mid back was 7 out of 10.  *Id*. at 112, 114.  On May 28, Plaintiff reported the pain in those areas had decreased, but only to 5 out of 10.  *Id*. at 110.

- On July 24, 2010, Plaintiff reported mid back pain at 7 of 10, along with neck and upper back pain at 5 of 10.  *Id*. at 108.  One week later, Plaintiff complained of upper back and left hip pain of 5 out of 10.  *Id*. at 106.

- On August 13, 2010, Plaintiff listed his upper back and left hip pain as 8 of 10.  *Id*. at 104.

- On September 9 and 10, 2010, Plaintiff indicated his mid back pain remained at 7 of 10.  *Id*. at 101, 100.

At various times throughout these appointments, Plaintiff reported that his back, neck, and shoulder pain interfered with his ability to function and perform daily activities.  On January 31, 2009, Plaintiff complained of significant pain and stiffness in his back, neck, and shoulders after playing tennis.  *Id*. at 161.  Even "[b]reathing aggravated the pain."  *Id*.  On May 22, 2010, Plaintiff experienced back, neck, and right shoulder pain after he rolled over in bed and heard a "pop."  *Id*. at 115.  Plaintiff's pain was so severe it was aggravated by any movement at all.  *Id*.

On July 24, 2010, Plaintiff complained of neck, mid back, and hip pain caused by simply shifting furniture in his home.  *Id*. at 102.  The pain persisted for over a week, "getting progressively worse," to the point where he could not sleep or function normally.  *Id*.  Plaintiff's

chiropractor, Alex Rodnick, noted Plaintiff's range of motion was "limited by pain and stiffness" and that his recovery would be "slowed due to spine instability and or exacerbation from activates [sic]." *Id.*

In April 2011, two months before Plaintiff was evaluated by Dr. Mankani for the LPO position, Plaintiff changed chiropractors and began treatment with Timothy Spink of Freeland Chiropractic. During their first consultation, Plaintiff indicated that his chief complaint was "pain." *Id.* at 93. Dr. Spink's notes indicate Plaintiff experienced "dull to sharp" low back pain after "lifting too much wood," and that Plaintiff's pain was exacerbated by "riding bikes" or "prolonged standing." *Id.* at 94.

During his deposition, Plaintiff established that at the time of his June 17, 2011 medical exam, his back pain remained "ongoing." Pl.'s Dep. 98, *attached as* Def.'s Mot. Ex. 1. He testified that his work as an arborist caused back strains or sprains that, at times, necessitated him taking off work. *Id.* at 101–02. Plaintiff indicated that the pain from these strains or sprains foreclosed his ability to do some of the strenuous work that his job required. *Id.* at 102. He discussed occasions where a strain or sprain "would come on suddenly, where [he] would do something and twist or bend or lift or exert some force" and would then notice pain right away. *Id.* at 103. One example Plaintiff offered was, after a bike ride, he experienced a sudden onset of pain while "bending down to tie [his] shoes." *Id.* at 104.

### C

Dr. Mankani also reviewed the medical records specific to Plaintiff's shoulder injuries and subsequent surgical treatments. The records revealed that on December 8, 2009, while Plaintiff was working for Dow Gardens, he attempted to leap over a drainage ditch. He did not clear the distance, bounced off of the opposite bank of the ditch, and smashed his shoulder into

the nearside bank.  Plaintiff heard a "loud pop" in his left shoulder and experienced immediate pain.  *Id*. at 40.  After the fall, Plaintiff sought medical treatment.  *Id*. at 40–41.  He was diagnosed with a "full thickness" rotator cuff tear, and a superior labrum anterior to posterior (SLAP) tear.  Def.'s Mot. Ex. 5–A, at 77, 79, 86.

On February 1, 2010, Dr. John Murphy performed a "mini open" rotator cuff repair and video arthroscopic procedure on Plaintiff's left shoulder to repair his torn rotator cuff and labrum.  *Id*. at 77–78.  Plaintiff then began physical therapy with Craig Elford of Active Orthopedics.  *Id*. at 88–89.  On April 27, 2010, Mr. Elford noted that Plaintiff was making "excellent progress" and consistently put forth "excellent effort," but nevertheless continued to experience pain at the top of his left shoulder when performing lifting activities, exercises, or range of motion stretches.  *Id*. at 85.  Mr. Elford indicated Plaintiff could only do two pushups, with pain, and was unable to perform any pull-ups.  *Id*.

On the same day, Dr. Murphy released Plaintiff to return to work and volunteer fire-fighting duties without restrictions.  It is unclear whether Mr. Elford's April 27 note was a part of Dr. Murphy's review.  Mr. Elford later discharged Plaintiff from physical therapy on June 7, 2010.  *Id*. at 84.  Although Plaintiff did not feel 100 percent, he felt "100% better."  *Id*.  Mr. Elford did note, however, residual deficits in both Plaintiff's strength and range of motion.  *Id*.

### D

With Plaintiff's physical examination complete, and having collected all the available relevant medical records, Dr. Mankani evaluated Plaintiff's fitness to be an LPO at Defendant's Midland Plant.  He also sat down with Ms. Chronowski to discuss her report, Plaintiff's medical records, and "what the outcome should be."  Mankani Dep. 9, *attached as* Def.'s Mot. Ex. 2.  Dr. Mankani testified that his subsequent determination was based on "a conglomeration" of the

- 7 -

records in Plaintiff's file, along with his own "general knowledge of occupational health and workplace practices." *Id*. at 14. In assessing Plaintiff's condition, Dr. Mankani evaluated "all the pieces of information" to determine what medical restrictions, if any, were appropriate. *Id*. at 15. This included Ms. Chronowski's physical examination findings, Plaintiff's medical test results, and a complete, up-to-date medical history. Mankani Aff. ¶ 3, *attached as* Def.'s Mot. Ex. 5.

Based on all of the information he had obtained and reviewed — specifically the medical history regarding Plaintiff's back and shoulder injuries — Dr. Mankani determined that Plaintiff's work activities should be restricted:

> Restrictions are needed to keep [Plaintiff] safe on the job: No repetitive bending/twisting/stooping; no heavy lifting >50 lbs; limited overhead/overshoulder pushing/pulling/lifting.

Def.'s Mot. Ex. 5–A, at 43.

### E

Following Plaintiff's pre-employment medical evaluation, Dr. Mankani reported Plaintiff's medical restrictions to Defendant's Human Resources Department, including Midland Plant HR Manager Elizabeth Stokes. Ms. Stokes reviewed Dr. Mankani's medical restrictions, compared them with the essential functions of the LPO position, and determined that the stated restrictions precluded Plaintiff from performing the essential functions of the LPO position. Stokes Aff. ¶ 9. Notably, Defendant found that Plaintiff could not safely respond to emergency situations or perform the heavy-exertion tasks required of an LPO during emergency response operations, potentially placing both Plaintiff and others in jeopardy.

Ms. Stokes informed Plaintiff that he could not perform the LPO position based on the restrictions established by Dr. Mankani. Stokes asked if Plaintiff had any ideas about how his

restrictions might be accommodated to enable him to perform the LPO job duties.  Pl.'s Dep. 118–19.  He had no suggestions.  *Id.*  In fact, Plaintiff acknowledged that under Dr. Mankani's suggested restrictions, he would not "be able to fully perform the duties of a loss prevention officer as outlined."  *Id.* at 118.  Because Plaintiff could not perform the essential functions of the LPO position, Defendant rescinded his conditional offer of employment on July 13, 2011.

### F

After Ms. Stokes informed Plaintiff that he was disqualified from the LPO job, he sent Defendant a statement from his newly-hired chiropractor — Craig Elford.  The statement was created on July 14, 2011, the day after Plaintiff's employment offer was rescinded, and delivered to Defendant some days later.  Therein, Mr. Elford established that he knew Plaintiff was "pursuing employment with Dow Corning Corporation" and that Plaintiff had informed him "that [Plaintiff] did not meet certain physical and medical criteria.  As a courtesy to him, I performed a physical therapy evaluation of his left shoulder today in our clinic."  Pl.'s Mot. Ex. 4, at 1.  Mr. Elford's assessment was that Plaintiff "is a very active, capable man status post SLAP repair 18 months ago. . . . An excellent surgical and rehabilitation outcome was achieved and I would not anticipate any abnormality or dysfunction to arise at the prior surgical site."  *Id.* at 2.  Notably, Mr. Elford did not address Plaintiff's ongoing, chronic back pain, or make any indication concerning Plaintiff's ability to perform the LPO position.

On July 18, 2011, Ms. Chronowski recorded on a case management communication sheet that Plaintiff had phoned "inquiring why restrictions were placed" on his ability to work.  Def.'s Mot. 5–A, at 46.  Ms. Chronowski indicated that she told Plaintiff "the LPO job is highly safety sensitive and based on a thorough review of his conditions, including the medical notes[,]

restrictions are necessary to keep him safe on the job.  Medical records that were generated after the pre-placement exam do not change the determination of the restrictions."  *Id*.

**G**

Unable to sway Defendant's decision to withdraw his offer, Plaintiff filed suit on May 21, 2012, alleging that Defendant "failed to hire [him] based on his disability and violated the ADA."  Pl.'s Compl. ¶ 16.  Plaintiff does not believe he is disabled.  He does believe that "Defendant perceived [him] to be disabled."  *Id*. at ¶ 10.

After this case commenced, both Defendant and Plaintiff retained medical experts and asked them to evaluate the medical restrictions outlined by Dr. Mankani.  Defendant retained occupational medicine specialist Dr. John Bernick, M.D., Ph.D.  Dr. Bernick reviewed Plaintiff's medical records and opined that the restrictions imposed by Dr. Mankani were "made to a degree of reasonable medical judgment."  Def.'s Mot. Ex. 6–A, at 2.  Dr. Bernick also established that "[Plaintiff's] past and current medical issues could pose a safety risk in the position of Loss Prevention Officer."  *Id*.

Plaintiff engaged Dr. Craig Peppler, D.O. as an expert witness.  Dr. Peppler authored a report wherein he opined that Dr. Mankani's restrictions were "based on mere speculation of possible physical harm."  Def.'s Mot. Ex. 3–A, at 4.  Importantly, Dr. Peppler's report was based only on "thirty or forty pages" of information, and he did not personally examine Plaintiff.  Peppler Dep. 4–5, *attached as* Def.'s Mot. Ex. 3.  During his deposition, Dr. Peppler was presented with records he had never reviewed concerning Plaintiff's ongoing back and shoulder pain.  His testimony was as follows:

> Q:    Doctor, based on what I've told you about things [Plaintiff] was telling his chiropractor for a period of, as I said, six years plus, isn't it fair to assume that on any given day [Plaintiff], when involved in physical activities, could have experienced a back strain or back spasms?

A:     It's certainly possible, yes.

Q:     And wouldn't it be fair to conclude that, as he's reported to his treaters in the past, that those spasms or strains could affect his ability to perform daily activities?

A:     Yes.

Q:     And given, if you assume that that's the case as of June of 2011, wouldn't it be reasonable to impose restrictions on his repetitive bending, twisting, stooping and heavy lifting?

A:     It could be reasonable, I suppose.

Peppler Dep. 31.

Both parties have now filed motions for summary judgment. Defendant maintains that, as a matter of law, Plaintiff is not "otherwise qualified" to perform the essential functions of the LPO position. Plaintiff contends just the opposite.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence must be drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Entry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

### III

Plaintiff seeks summary judgment on two issues: "First, the Defendant violated the medical testing requirements of the ADA when it failed to perform an individualized inquiry of [Plaintiff]. Second, the Defendant violated the ADA when it perceived [Plaintiff] as unable to perform the essential functions of the position." Pl.'s Reply 1, ECF No. 23. Defendant contends otherwise: that it was "entitled to rely on [Dr. Mankani's] medical judgment," which was the result of an individualized inquiry, and that the medical restrictions he imposed "prevented [Plaintiff] from performing the essential functions of the [LPO] job." Def.'s Mot. 1.

As will be discussed at length, Defendant did, as a matter of law, perform an individualized inquiry as required by the ADA. The restrictions Dr. Mankani imposed after that inquiry were objectively reasonable, as Plaintiff's own expert acknowledged, because they were based on objective medical evidence and Plaintiff's up-to-date medical records. In addition, Defendant was entitled to conclude that Plaintiff could not perform the essential functions of the LPO position because of those restrictions. Accordingly, Defendant's motion for summary judgment will be granted, and Plaintiff's motion will be denied.

### A

The ADA prohibits employers from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a *prima facie* case under the ADA, "a plaintiff must show that he is disabled and otherwise qualified for the position, either with or without reasonable accommodation." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 923 (6th Cir. 2013) (citing *Kiphart v. Saturn Corp.*, 251 F.3d 573, 581 (6th Cir. 2001)). These two issues — whether Plaintiff is disabled and yet otherwise qualified for the LPO position — will be addressed in turn.

**B**

An individual is considered "disabled" under the ADA if he "(1) has a physical or mental impairment that substantially limits one or more of the major life activities of such individual, (2) has a record of such impairment, or (3) is regarded by her employer as having such an impairment." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008) (internal quotation marks omitted) (quoting *Gruener v. Ohio Casualty Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008)); *see also* 42 U.S.C. § 12102(2).

Plaintiff does not contend that he is substantially limited in performing any major life activities, nor has he offered any evidence that he has suffered from such an impairment.  On the contrary, Plaintiff maintains he "is a triathlete, a bicycle racer, and an industrial athlete.  He can climb a tree with nothing more than a piece of rope and a carabineers.  [He] is in incredibly good shape, and could easily perform any function required of a Loss Prevention Officer at Dow Corning."  Pl.'s Mot. 17.  When filling out a medical history form for Freeland Chiropractic and Dr. Spink in April 2011, Plaintiff indicated he was not disabled and had never been disabled. Def.'s Mot. Ex. 5–A, at 93.  Further, in his complaint, Plaintiff asserts that "Defendant perceived [him] to be disabled" and that he is therefore an individual with a disability, which "includes being regarded as having such an impairment under 42 U.S.C. § 12102(1)(C)."  Pl.'s Compl. ¶¶ 10, 13.  Because Plaintiff has offered no evidence that he suffers from substantially limiting impairments, at any point in his life, he contends that Defendant erroneously regarded him as suffering from a disability.

Notably, and initially puzzling to the Court, both parties omitted any discussion of how Defendant regarded Plaintiff as disabled.  Indeed, it seemed odd in light of the fact that the ADA only prohibits employers from discriminating against a "qualified individual with a disability

- 13 -

because of [that] disability." *Burns v. Coca-Cola Enters., Inc.*, 222 F.3d 247, 253 (6th Cir. 2000) (quoting *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 633 (6th Cir. 1998)). This omission is further surprising because demonstrating a disability is an element of Plaintiff's *prima facie* case.[2]

However, in 2008 Congress enacted the ADA Amendments Act of 2008 (ADAAA), which became effective January 1, 2009. Through the ADAAA, Congress changed the way courts are to review "regarded as" claims under the ADA. Previously, pursuant to the standard established by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999), "regarded as" claimants were required to show that their employers believed them to be substantially impaired in a major life activity or unable to work in a broad class of jobs. The ADAAA abrogated *Sutton*. *See Powers v. USF Holland, Inc.*, 667 F.3d 815, 823 n.7 (7th Cir. 2011).

Under the new regime — the ADA post January 1, 2009 — "regarded as" claimants no longer need to demonstrate that their employer believed them to be substantially limited in a major life activity. Instead,

> an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, *whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity*. Prohibited actions include . . . refusal to hire.

29 C.F.R. § 1630.2(l)(1) (emphasis added). "Whether an individual's impairment 'substantially limits' a major life activity is not relevant to coverage under paragraph (g)(1)(iii) (the 'regarded as' prong) of this section." § 1630.2(j)(2).

---

[2] Although Plaintiff need not be actually disabled, an individual who is "regarded as" disabled "counts as disabled for purposes of the [ADA]." *Mahon v. Crowell*, 295 F.3d 585, 589–90 (6th Cir. 2002) (citing 42 U.S.C. §12102(2)(C)).

The puzzling result is that plaintiffs are now entitled to protection under the ADA without evidence that they are "disabled," or that an employer regarded them as such.  It is enough that an employer took some adverse employment action because of some impairment, whether real or imagined, no matter how insubstantial.[3]

This explains why the parties considered it unnecessary to address how Defendant regarded Plaintiff as disabled — Congress no longer considers it relevant.  Plaintiff has satisfied his burden under the "regarded as" prong of the ADA by producing evidence that Defendant did not hire him because of his back and shoulder problems; regardless of whether Defendant viewed those impairments to be substantially limiting.

## C

Of course, Plaintiff's demonstration that he is "disabled" pursuant to the ADA, and that Defendant did not hire him because of it, is not enough to entitle him to recovery.  To succeed on his claim, Plaintiff must also show that he is "otherwise qualified" for the LPO position.  *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1266 (4th Cir. 1995)).   An individual is only "otherwise qualified" if he "can perform the essential functions of the job in question."  *Estate of Mauro*, 137 F.3d at 402 (citing *Bradley v. Univ. of Texas M.D. Anderson Cancer Ctr.*, 3 F.3d 922, 924 (5th Cir. 1993) (per curiam)).

Although such an inquiry typically involves whether the individual can perform the essential functions of a job "with or without reasonable accommodation," *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010) (citation omitted), this is not so when a plaintiff is only "regarded as" being disabled; or to use the language of 29 C.F.R. § 1630.2(l)(1), regarded

---

[3] So long as the impairment is not considered "transitory and minor," or an impairment with an "actual or expected duration of 6 months or less."  42 U.S.C. § 12102(3)(B).

as suffering from "an actual or perceived physical or mental impairment."  Instead, when a plaintiff is disabled because his employer regards him as such, the employer is not required to entertain or consider reasonable accommodations.  42 U.S.C. § 12201(h); *see also Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 (6th Cir. 1999) (a finding that plaintiff was "regarded as" being disabled "would obviate the Company's obligation to reasonably accommodate"); *Baker v. Windsor Republic Doors*, 414 F. App'x 764, 776 (6th Cir. 2011) (where plaintiff relies upon the "regarded as" disability prong under the ADA, an employer's responsibility to offer reasonable accommodation is obviated).  This is not puzzling, as Congress intended the "regarded as" legal theory to address individuals who are thought to be disabled, but in reality, are not.  Accordingly, these individuals can be expected to perform the essential functions of a position without accommodation.

It is undisputed that Defendant concluded Plaintiff could not perform the essential functions of the LPO position and rescinded his conditional offer of employment based on Dr. Mankani's medical restrictions.[4]   In addition, Plaintiff has acknowledged that under Dr. Mankani's restrictions, he could not perform the essential functions of the LPO position.  *See* Pl.'s Dep. 118.   Therefore, all that remains is whether Dr. Mankani's restrictions were appropriate and whether Defendant was permitted to rely upon them.[5]

---

[4]  Plaintiff established that "[o]n July 13, 2011, [Defendant] notified [Plaintiff] that because of his restrictions he was unable to perform the essential job functions of the Loss Prevention Officer and therefore, the officer [sic] of employers [sic] was revoked."  Pl.'s Mot. 9.  Defendant concedes the point: "It is undisputed that [Defendant] disqualified Plaintiff from the LPO job because of the restrictions established by Dr. Mankani based on his medical evaluation."  Def.'s Mot. 14.

[5]  In *White v. Interstate Dist. Co.*, 438 F. App'x 415 (6th Cir. 2011) the Sixth Circuit dealt with a similar situation, where a plaintiff admitted that based on specific medical restrictions, he could not perform the essential functions of his job.  *Id.* at 418.  The court concluded, "White's admitted inability to perform these duties defeats his claims under the ADA."  *Id.*  It follows that if Dr. Mankani's restrictions were appropriate — because Plaintiff has admitted he could not perform the essential functions of the LPO position under those restrictions — Defendant would be entitled to summary judgment.

**1**

The Sixth Circuit explained in *Holiday v. City of Chattanooga*, 206 F.3d 637 (6th Cir. 2000), that an employer is required to conduct an "individualized inquiry" into a plaintiff's actual medical condition before making employment decisions:

> The ADA mandates an individualized inquiry in determining whether an employee's disability or other condition disqualifies him from a particular position. In order to properly evaluate a job applicant on the basis of his personal characteristics, the employer must conduct an individualized inquiry into the individual's actual medical condition, and the impact, if any, the condition might have on that individual's ability to perform the job in question.

*Id.* at 643; *see also Jones v. Nissan N. Am., Inc.*, 438 F. App'x 388, 398 (6th Cir. 2011).

In *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1 (6th Cir. 2012) (unpublished), the Sixth Circuit established a well-reasoned guide for determining if a medical assessment satisfies the required "individualized inquiry." In that case, the court determined that a doctor who "obtained much individualized information about Wurzel's medical condition. . . . saw Wurzel himself . . . obtained the medical opinions of Wurzel's treating cardiologists . . . [and whose] medical knowledge of Wurzel's condition was current" had conducted an "individualized inquiry" within the meaning of the ADA. *Id.* at *15.

Likewise, Dr. Mankani satisfied the ADA's requirement for a reasonable medical examination based on Plaintiff's actual medical condition. Dr. Mankani obtained all of Plaintiff's medical information, including every record concerning ongoing back pain and a 2010 shoulder surgery. Thus, Dr. Mankani reviewed the most recent medical information from each of Plaintiff's treating physicians. Plaintiff was directed to fill out medical questionnaires regarding his treatment history, and Dr. Mankani reviewed that information as well. Further, although he did not conduct the physical examination himself, Dr. Mankani discussed with Ms.

Chronowski the evaluation that she performed at his direction and under his supervision.[6]   The two then discussed whether any medical restrictions were necessary.[7]   Only then did Dr. Mankani come to his conclusions regarding Plaintiff's work restrictions.   This is exactly the type of individualized inquiry, based on Plaintiff's current medical capabilities, the ADA demands.

Plaintiff argues that Dr. Mankani's conclusions "are the result of subjective inferences without the benefit of an in person exam, and are not based on objective evidence directly about the individual."  Pl.'s Mot. 12.   The nub of Plaintiff's argument is that "Dr. Mankani did not perform an individual inquiry" and therefore his review "does not meet the requirements of the ADA."  *Id.* at 13.   Plaintiff admits, however, that "Becky Chronowski performed an individual inquiry."  *Id.*   In the end, Plaintiff's arguments are simply without merit.   Dr. Mankani did have the benefit of an in person exam — conducted by his own physician's assistant, which he then discussed with her at length.   His review was based on objective evidence directly related to Plaintiff; in fact, Dr. Mankani reviewed the current records from all of Plaintiff's treating physicians (unlike Dr. Peppler, Plaintiff's own expert).   It makes little sense for Plaintiff to argue that Ms. Chronowski performed an individualized inquiry, but that the doctor she reported to and discussed her findings with did not.   Dr. Mankani's extensive review, including his discussions with Ms. Chronowski, constitutes an individualized inquiry under the ADA.

---

[6] Mich. Comp. Laws § 333.17049 establishes that a physician who supervises a physician's assistant is responsible for evaluating the physician's assistant's performance and monitoring the physician's assistant's practice and provision of medical care services.  § 333.17049(1)(b)–(c).

[7] Plaintiff makes much of the fact that Ms. Chronowski reported she was "leaning toward no restrictions for the LPO job."  Def.'s Mot. Ex. 5–A, at 48.  However, Ms. Chronowski went on the note, "Please review and let me know your thoughts."  *Id.*   Accordingly, Ms. Chronowski had clearly not "passed" Plaintiff on his medical evaluation, as Plaintiff contends.  *See* Pl.'s Mot. 11 ("The fact that the Plaintiff passed the medical examination performed by the Defendant is sufficient to show he was qualified.").  Instead, she indicated her initial impressions, which she then discussed with her supervising physician (Dr. Mankani) who made any final decisions.

**2**

The next question is whether Defendant was entitled to rely upon Dr. Mankani's reported restrictions. Defendant cites a number of cases for the proposition that an employer may rely upon a reasonable medical judgment when determining whether an applicant is "otherwise qualified" for a position.[8] *See* Def.'s Reply 1, ECF No. 24. Plaintiff argues that such reliance is only relevant under the "direct threat" analysis; an issue Defendant does not raise.[9] Because

---

[8] In support of this proposition, Defendant cites the following cases: *Johnson v. Cleveland City School Dist.*, 443 F. App'x 974, 986 (6th Cir. 2011) ("The doctors' restrictions must be taken at face value and the District was reasonable — indeed, correct — to assume that Johnson could not perform a task that her doctors indicated she was incapable of safely performing."); *Manigan v. Southwest Ohio RTA*, 385 F. App'x 472, 478 (6th Cir. 2010) (Any argument by plaintiff that he could perform a specific essential function of his truck-driver position "would fail, however, in light of his doctor's restrictions."); *Holiday v. City of Chattanooga*, 206 F.3d 637, 645 (6th Cir. 2000) (where court held employer could *not* rely upon "unsubstantiated and cursory medical opinion"); *Pesterfield v. TVA*, 941 F.2d 437, 442 (6th Cir. 1991) (although dealing with the Rehabilitation Act, the court held "the district court properly concluded that TVA was entitled to terminate plaintiff because it reasonably believed, based primarily on Dr. Paine's report, it could not accommodate plaintiff's psychological condition.").

[9] Indeed, Defendant seemingly refrains from arguing that Plaintiff could constitute a direct threat to himself or other workers at the Midland Plant: "Plaintiff argues that an employer may consider a reasonable medical judgment only in a 'direct threat' case, not in considering whether an applicant is 'otherwise qualified' for a position. Plaintiff is incorrect." Def.'s Reply 1. Under "direct threat" analysis, a disabled individual is not "qualified" for a specific employment position if he or she "poses a 'direct threat' to the health or safety of others which cannot be eliminated by a reasonable accommodation." *Wurzel v. Whirlpool Corp.*, 482 F. App'x 1, at *11 (6th Cir. 2012) (citations omitted). The analysis entails one question: Did the plaintiff's activities at his job pose a direct threat or significant risk to the health or safety of others? *Id.* "There are four factors to be considered in a direct-threat analysis: (i) the duration of the risk, (ii) the nature and severity of the potential harm, (iii) the likelihood that the potential harm will occur, and (iv) the imminence of the potential harm." *Id*. (citing 29 C.F.R. § 1620.2(r)).

So, the Court is faced with additional puzzling question: whether the "direct threat" risk analysis is relevant here. At least two circuits have held it is a plaintiff's burden to show he or she can perform the essential functions of a job without endangering others: "[The plaintiff] failed to produce probative evidence that he was not a direct threat." *LaChance v. Duffy's Draft House, Inc.*, 146 F.3d 832, 835 (11th Cir. 1998); *see also EEOC v. Amego, Inc.*, 110 F.3d 135, 144 (1st Cir. 1997) ("Where those essential job functions necessarily implicate the safety of others, plaintiff must demonstrate that she can perform those functions in a way that does not endanger others.").

Other courts consider "direct threat" a defense, with the burden on the defendant: "Although we have previously declined to resolve which party bears the burden of proving direct threat, we now hold that the employer bears the burden of proof, as the direct threat defense is an affirmative defense." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 571 (8th Cir. 2007) (citations omitted); *see also Dadian v. Vill. of Wilmette*, 269 F.3d 831, 841 (7th Cir. 2001) (Direct threat analysis under "Titles I (employment) and III (public accommodations) of the ADA have been interpreted to place the burden of proof on the defendant."); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 220 (2d Cir. 2001) (noting employer "has failed to provide any evidence that the plaintiff poses a significant risk of substantial harm."); *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999) (Because

Defendant does not contend — or at least rely upon the assertion — that Plaintiff was a "direct threat," and the majority of circuits have treated it as a defense, it will not be entertained here.  In any event, the authority providing that an employer may rely upon a reasonable medical judgment, even outside a "direct threat" analysis, is substantial.

In addition to the cases cited by Defendant, two Sixth Circuit decisions — although addressing the ADA as it existed pre-January 1, 2009 — provide that an employer is justified in relying upon the guidance of a physician when determining if an employee can perform a job function.  In *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661 (6th Cir. 2008), the court concluded that the defendant did not violate the ADA because the plaintiff "admits that [Defendant's] understanding of her impairments and how they limited her simply tracked the specific and valid restrictions prescribed by her own doctor."  *Id.* at 665.  In *Cannon v. Levi Strauss & Co.*, 29 F. App'x 331, 336 (6th Cir. 2002), the court concluded that the defendant did not violate the ADA and "view [the plaintiff] through stereotypes based on her impairment but rather followed the specific recommendations of her treating physician."

Likewise, Defendant was permitted to rely upon Dr. Mankani's medical restrictions because they were objectively reasonable.  It would be a burdensome standard indeed to require employers to discount the reasonable judgments of medical professionals when determining whether a potential employee can perform an occupational task.[10]

---

[direct threat] is an affirmative defense, Wal-Mart bears the burden of proving that Nunes is a direct threat."); *Rizzo v. Children's World Learning Ctrs., Inc.*, 84 F.3d 758, 764 (5th Cir. 1996) (As will all affirmative defenses, the employer bears the burden of proving that the employee is a direct threat.").  However, the Sixth Circuit "has not yet ruled on this issue."  *Wurzel*, 482 F. App'x at *12 n.14.

[10] The ADA does not include any mechanism or procedure for a plaintiff to challenge the medical judgment of a doctor hired by an employer; such as the similar procedure under the statutory code governing the Family Medical Leave Act (FMLA) wherein an employer may challenge a plaintiff's medical opinion.  The relevant provision of that code provides as follows:
   (d) Resolution of conflicting opinions
        (1) In general

So although *Gruener* and *Cannon* address situations where an employer relied upon the plaintiff's treating physician,[11] this distinction is offset by Dr. Mankani's performance of an individualized inquiry based on all of Plaintiff's up-to-date medical information. The restrictions he determined were substantiated by Plaintiff's expert during his deposition when he was confronted with the numerous medical records he had not previously reviewed. *See* Peppler Dep. 31. In addition, Dr. Bernick, Defendant's expert, opined that "the restrictions Dr. Mankani placed on [Plaintiff's] work activities were a reasonable medical judgment based on [Plaintiff's] condition in June 2012."[12]  Bernick Aff. ¶ 5, *attached as* Def.'s Mot. Ex. 6.

Because Dr. Mankani's restrictions were reasonable medical judgments based on an individualized inquiry, the Court is satisfied that they comport with the ADA. Further, these restrictions were not disputed by any medical professional with the knowledge of Plaintiff's full

---

In any case in which the second opinion . . . differs from the opinion in the original certification . . . the employer may require, at the expense of the employer, that the employee obtain the opinion of a third health care provider designed or approved jointly by the employer and the employee . . .
(2) Finality
The opinion of the third health care provider . . . shall be considered to be final and shall be binding on the employer and the employee.
29 U.S.C. § 2613.

[11] Concerning his treating physicians, Plaintiff argues that Plaintiff was returned to work "without restrictions" by the doctor that performed his shoulder surgery, Dr. Murphy, and he was therefore qualified for the LPO position. Pl.'s Mot. 11. Plaintiff does not explain, however, whether Dr. Murphy considered the observation of Plaintiff's physical therapist that he could only do two pushups, "with pain," and could not perform any pull-ups the day Dr. Murphy released Plaintiff to volunteer fire-fighter duties. *See* Def.'s Mot. Ex. 5–A, at 85. Further, there is no evidence Dr. Murphy was aware of and considered Plaintiff's chronic back pain. Additionally, the statement concerning Plaintiff delivered by Mr. Elford in the days after Plaintiff's offer was rescinded is irrelevant. "The determination of whether an individual is qualified for purposes of the ADA is a two-step process, and should be made as of the time of the employment decision." *EEOC v. Wal-Mart Stores, Inc.*, 477 F.3d 561, 568 (8th Cir. 2007) (quoting *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1047 (8th Cir. 1999)).

[12] It appears Dr. Bernick mistakenly indicated June 2012, when in reality Plaintiff's condition was assessed as of June 2011.

medical record.[13]   And, even if Plaintiff had acquired such a well-formed opinion, it is not entirely clear the opinion would be relevant, as the ADA does not provide for a plaintiff to challenge the reasonable medical judgment an employer relies upon (unlike the FMLA).

The final question is whether, based on Dr. Mankani's reasonable restrictions, Defendant was justified in concluding Plaintiff could not safely perform the LPO position.   A great deal of time need not be spent with this issue.   As Plaintiff himself has admitted, under Dr. Mankani's restrictions, he "[c]ould not" perform the LPO position's essential functions.   Pl.'s Dep. 118. Defendant's identical conclusion is not contrary to the requirements of the ADA.

Defendant's motion for summary judgment will be granted.

### D

One final issue requires attention.   Along with his motion for summary judgment, Plaintiff submitted a video clearly establishing his ability to hoist himself into treetops as a part of his work as an arborist.   Plaintiff includes this video to support his argument that he is physically capable of working as an LPO.   However, whether Plaintiff can climb trees carries no relevance to the determination of whether Dr. Mankani's restrictions were based upon an individualized inquiry, were reasonably relied upon, and foreclosed Plaintiff's ability to perform the LPO position.   Plaintiff's motion that the video be reviewed "as a part of the record in this matter" will be denied.   Pl.'s Mot. Review 2, ECF No. 15.

### IV

Accordingly, it is **ORDERED** that Defendant's motion for summary judgment, ECF No. 16, is **GRANTED**.

---

[13] When Mr. Elford examined Plaintiff and indicated he was "a very active, capable man," Pl.'s Mot. Ex. 4, at 2, he did so without the benefit of Plaintiff's chiropractic records indicating ongoing, chronic back pain.   Dr. Murphy's review was similarly limited.   Dr. Peppler, Plaintiff's own expert, established that Plaintiff's restrictions "could be reasonable" once he was informed of that information.   Peppler Dep. 31.

It is further **ORDERED** that Plaintiff's motion for summary judgment, ECF No. 14, is **DENIED**.

It is further **ORDERED** that Plaintiff's motion regarding his summary judgment motion, ECF No. 15, is **DENIED**.

It is further **ORDERED** that Plaintiff's complaint, ECF No. 1, is **DISMISSED** with prejudice.  This is a final order and closes the case.

Dated: May 10, 2013                                   s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 10, 2013.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS