UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RAYMOND JENNINGS,

        Plaintiff,                         Case No. 12-12227
                                                           Honorable Thomas L. Ludington

v.

DOW CORNING CORPORATION,

        Defendant.

_____/

**OPINION AND ORDER DENYING MOTION FOR RECONSIDERATION**

Dow Corning Corporation (Dow Corning) offered Raymond Jennings a job as a Loss Prevention Officer (LPO) in June 2011. The offer was conditioned upon Jennings successfully completing a pre-employment medical evaluation because his duties as an LPO would involve, among other things, responding to emergencies and coordinating rescue operations in a chemical manufacturing facility. The Medical Director of Dow Corning's Employee Health Services Department—Sushil Mankani, M.D.—performed a thorough examination and determined that Jennings required certain work restrictions to keep him safe on the job. Based on those restrictions, Dow Corning concluded that Jennings could not perform as an LPO and rescinded the offer of employment. Jennings disagrees. He contends that Dr. Mankani's restrictions are baseless and that he can perform the job. And because he believes that Dow Corning's conduct violated the American With Disabilities Act (ADA), Jennings filed suit.

The Court concluded that Dow Corning's determination concerning whether Jennings was "otherwise qualified" for the position he sought was based on an individualized inquiry. As a result, the Court granted Dow Corning's motion for summary judgment and denied Jennings's cross motion, ECF No. 25. On May 22, 2013, Jennings filed a motion to reconsider that

decision. He contends that "[Dow Corning] and Dr. Mankani failed to perform an individualized inquiry to determine what impact [Jennings's] back-pain report to his chiropractor would have on his ability to perform the essential functions of a Loss Prevention Officer (LPO)." Pl.'s Mot. 1. Upon review, the Court is not persuaded, and Jennings's motion for reconsideration will be denied.

# I

Local Rule 7.1 allows a party to bring a motion for rehearing or reconsideration where the Court has been misled by a palpable defect, and where "correcting the defect will result in a different disposition of the case." E.D. Mich. LR 7.1(h)(3). A "palpable defect" is "a defect that is obvious, clear, unmistakable, manifest or plain." *Witzke v. Hiller*, 972 F. Supp. 426, 427 (E.D. Mich. 1997) (citing Webster's New World Dictionary 974 (3rd Ed. 1988)). A motion for reconsideration, however, will not be granted if it "merely present[s] the same issues ruled upon by the court, either expressly or by reasonable implication." E.D. Mich. LR 7.1(h)(3).

# II

## A

Jennings explains: "The Court made a clear error in granting the motion." Pl.'s Mot. 1. He says the Court "failed to properly apply Sixth Circuit precedent outlined in *Keith v. Oakland County*, 703 F.3d 918 (6th Cir. 2013)." *Id.* Although Jennings does not indicate precisely which standard from *Keith* was misapplied,[1] he does explain as follows: "the Court made a clear error when it concluded that Dr. Mankani performed an individualized inquiry into the impact of

---

[1] The court in *Keith* established that "[t]he issues in dispute are whether Oakland County made an individualized inquiry, whether Keith is otherwise qualified for the position in question with or without reasonable accommodation, and whether Oakland County engaged in the interactive process." *Keith v. Oakland Cnty.*, 703 F.3d 918, 923 (6th Cir. 2013). So there are three possible issues with applicable standards to choose from.

reports of back pain would have on Mr. Jennings [sic] ability to act as a[n] LPO." Pl.'s Mot. 6. The Court continues to conclude that an individualized inquiry was conducted.

*Keith*'s discussion of the ADA's requirement for an "individualized inquiry" establishes that "[a] proper evaluation involves consideration of the applicant's personal characteristics, his actual medical condition, and the effect, if any, the condition may have on his ability to perform the job in question." *Keith*, 703 F.3d at 923. The court continued: "The ADA requires employers to act, not based on stereotypes and generalizations about a disability, but based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Id*. (citation omitted).

In the May 10, 2013 opinion, this Court utilized the same standard (although citing a different Sixth Circuit case). *See* May 10, 2013 Op. & Order 17 (citing *Holiday v. City of Chattanooga*, 206 F.3d 637, 643 (6th Cir. 2000)), ECF No. 25. The Court concluded that Dow Corning "did, as a matter of law, perform an individualized inquiry as required by the ADA." May 10, 2013 Op. & Order 12. The reasoning underlying this conclusion was straightforward: Dr. Mankani performed an evaluation based on Jennings's "actual medical condition." *Id*. at 17. Dr. Mankani then set forth objectively-reasonable work restrictions to keep Jennings "safe on the job." Def.'s Mot. Summ. J. 5–A, at 46. After considering those restrictions and the LPO position's essential functions, Dow Corning concluded that Jennings could not perform the position—based upon his actual condition—and the offer of employment was rescinded.[2]

One could conclude, after reading Jennings's motion, that he believes the Court did not determine whether an individualized inquiry was performed. (He emphasizes that the Court "found that Dr. Mankani satisfied the ADA's requirement for a reasonable medical examination.

---

[2] Jennings agrees that, under Dr. Mankani's restrictions, he could not perform the essential functions of the LPO position. Pl.'s Dep. 118, *attached as* Def.'s Mot. Summ. J. Ex. 1. He only contests whether those restrictions are appropriate.

- 3 -

The ADA does not require a reasonable evaluation, it requires an individual inquiry." Pl.'s Mot. 1 (footnote omitted).) But this would not be accurate because Jennings goes on to acknowledge that "[t]he Court relies on *Wurtzel v. Whirlpool Corp.*, 482 F. App'x 1 (6th Cir. 2012) (unpublished) *to support the conclusion that Dr. Mankani performed an individualized assessment*." Pl.'s Mot. 1 (emphasis added). And as Jennings points out, the Court expressly concluded in the May 10 opinion that an individualized inquiry had been performed. The Court indicated that Dr. Mankani's medical examination was "exactly the type of individualized inquiry, based on [Jenning's] current medical capabilities, the ADA demands[,]" and that "Dr. Mankani's extensive review, including his discussions with Ms. Chronowski, constitutes an individualized inquiry under the ADA." May 10, 2013 Op. & Order 18. The Court also determined that Dow Corning relied upon Dr. Mankani's evaluation—assessing Jennings's abilities in light of the LPO position's essential functions—and its conduct therefore did not violate the ADA. *Id*. at 19–21.

While the Court did explain that Dr. Mankani "satisfied the ADA's requirement for a reasonable medical examination based on Plaintiff's actual medical condition[,]" *id*. at 17, this was not the creation of a new standard under the ADA or a misapplication of the law. Rather, it was the introduction of the section analyzing the question of whether an individualized inquiry had been performed. Opening the discussion using the words "reasonable medical examination" was not palpable error. Just as the Sixth Circuit in *Keith* paraphrased an "individualized inquiry" as "[a] proper evaluation," 703 F.3d at 923, this Court restated an "individualized inquiry" as "a reasonable medical examination." May 10, 2013 Op. & Order 17. And then, analyzing the facts under the applicable law, determined that Dr. Mankani and Dow Corning had performed an "individualized inquiry." *Id*. at 17, 18. And even if the use of the phrase "reasonable medical

examination" instead of "individualized inquiry" was erroneous, it was harmless. Replacing the former with the latter would not change the Court's subsequent analysis or its eventual determination.

Alternatively, it is possible that Jennings is taking issue with the Court's ultimate conclusion that an individualized inquiry had been conducted. But a motion for reconsideration does not permit a party to rehash arguments a second time. *See* E.D. Mich. LR 7.1(h)(3). The parties argued at length concerning whether Dow Corning and Dr. Mankani performed an individualized inquiry, and the Court ultimately decided that they had. That decision, which the Court continues to believe is sound, should not be revisited under Local Rule 7.1.

**B**

And even if Jennings's argument was one the Court had not previously addressed, his claim that Dow Corning and Dr. Mankani did not perform an individualized inquiry is without merit.

**1**

Jennings contends as follows: "What should be most troubling to the Court is . . . Defendant's ability to justify the restrictions by saying that the plaintiff told his chiropractor his back hurt." Pl.'s Mot. 3. Jennings continues: "The critical question should be whether the reports of back pain impact [Jennings's] ability to perform the position of LPO." Pl.'s Mot. 3. The Court agrees—how Jennings's back pain would affect his ability to perform the essential functions of the LPO position is undoubtedly the critical issue in the case. And, just as clearly, this was considered by Dow Corning when it determined Jennings was not fit for the LPO position.

Contrary to Jennings's assertion, it was not just his reports of back pain that Dr. Mankani relied upon to determine work restrictions, but Jennings's consistent reports of *disabling* back

pain. From the beginning of 2009 through September 2010, Jennings reported back pain at seven out of ten or higher during sixteen different appointments with his chiropractor. *See* May 10, 2013 Op. & Order 4–5 (citing Def.'s Mot. Summ. J. Ex. 5–A, at 100–160). And he reported more than just pain. On multiple occasions, Jennings indicated that his pain "interfered with his ability to function and perform daily activities." May 10, 2013 Op. & Order 5. As the Court explained,

> On January 31, 2009, Plaintiff complained of significant pain and stiffness in his back, neck, and shoulders after playing tennis. [Def.'s Mot. Summ. J. Ex. 5–A,] at 161. Even "[b]reathing aggravated the pain." *Id*. On May 22, 2010, Plaintiff experienced back, neck, and right shoulder pain after he rolled over in bed and heard a "pop." *Id*. at 115. Plaintiff's pain was so severe it was aggravated by any movement at all. *Id*.
>
> On July 24, 2010, Plaintiff complained of neck, mid back, and hip pain caused by simply shifting furniture in his home. *Id*. at 102. The pain persisted for over a week, "getting progressively worse," to the point where he could not sleep or function normally. *Id*. Plaintiff's chiropractor, Alex Rodnick, noted Plaintiff's range of motion was "limited by pain and stiffness" and that his recovery would be "slowed due to spine instability and or exacerbation from activates [sic]." *Id*.
>
> In April 2011, two months before Plaintiff was evaluated by Dr. Mankani for the LPO position, Plaintiff changed chiropractors and began treatment with Timothy Spink of Freeland Chiropractic. During their first consultation, Plaintiff indicated that his chief complaint was "pain." *Id*. at 93. Dr. Spink's notes indicate Plaintiff experienced "dull to sharp" low back pain after "lifting too much wood," and that Plaintiff's pain was exacerbated by "riding bikes" or "prolonged standing." *Id*. at 94.
>
> During his deposition, Plaintiff established that at the time of his June 17, 2011 medical exam, his back pain remained "ongoing." Pl.'s Dep. 98, *attached as* Def.'s Mot. [Summ. J.] Ex. 1. He testified that his work as an arborist caused back strains or sprains that, at times, necessitated him taking off work. *Id*. at 101–02. Plaintiff indicated that the pain from these strains or sprains foreclosed his ability to do some of the strenuous work that his job required. *Id*. at 102. He discussed occasions where a strain or sprain "would come on suddenly, where [he] would do something and twist or bend or lift or exert some force" and would then notice pain right away. *Id*. at 103. One example Plaintiff offered was, after a bike ride, he experienced a sudden onset of pain while "bending down to tie [his] shoes." *Id*. at 104.

May 10, 2013 Op. & Order 5–6.

Dr. Mankani reviewed all of this information, along with extensive records concerning Jennings's 2010 shoulder surgery and subsequent recovery, in determining whether work restrictions were appropriate. He considered the results of an in-person medical examination performed by his certified Physician's Assistant, Rebecca Chronowski. Dr. Mankani's examination was also supplemented by a review of various medical test results from the physical examination and a medical questionnaire Jennings filled out.

This evaluation was based upon Jennings's actual medical condition, not "stereotypes and generalizations." *See Keith*, 703 F.3d at 923. Dow Corning then properly relied upon the work restrictions Dr. Mankani imposed to assess whether Jennings could perform the LPO position. Its subsequent conclusion—Jennings could not perform the LPO position's essential functions—was an appropriate "individualized inquiry" under the ADA.

**2**

Jennings argues that "[t]he Court's analysis parallels that which was recently overturned in *Keith*." Pl.'s Mot. 3 (footnote omitted). He contends that the lower court there "concluded that all the pieces together were sufficient to show an individualized inquiry." Pl.'s Mot. 3. Believing that conclusion was overturned, Jennings argues by analogy that this Court's decision is similarly flawed. His argument, however, is unfounded.

Jennings is correct when he notes that in *Keith*, the Sixth Circuit reviewed a lower court decision where that court "concluded that Oakland County, the ultimate decision-maker, made an individualized inquiry." *Keith*, 703 F.3d at 924. But his additional assertions on the issue are mistaken. The lower court's conclusion that an individualized inquiry had been performed was not overturned—in fact, the Sixth Circuit established: "We do not disagree with this conclusion."

*Id*. The court noted that "Keith's abilities were observed during lifeguard training, accommodations were proposed to integrate Keith into the lifeguard team, and both staff and management were on board with the plan to hire Keith." *Id*.

Instead of condemning Oakland County's individualized inquiry, as Jennings contends, the court questioned the situation where an employer "make[s] an individualized inquiry only to defer to the opinions and advice of those who have not[.]" *Id*. You see, after Oakland County performed an individualized inquiry, it deferred to a doctor that had "failed to make an individualized inquiry" to determine that the plaintiff was not otherwise qualified. *Id*. at 923. The doctor Oakland County relied upon "entered the examination room and briefly reviewed Keith's file" before declaring, "He's deaf; he can't be a lifeguard." *Id*. at 923–24.

This case, on the other hand, involves Dow Corning's reliance on Dr. Mankani's reasonable work-related restrictions. Those restrictions were the result of a thorough evaluation—one that involved an in-person medical examination, a review of the most up-to-date medical history, and various medical test results. Dow Corning did not commit the mistake that was condemned in *Keith*. Indeed, Dow Corning relied on the one individual who *did* perform a comprehensive examination of Jennings's medical condition. It follows that Jennings's reliance on *Keith* is misplaced.

### 3

Jennings also rails that Dr. Mankani "did not determine what the effect of Jennings' condition would have on his ability to do the job." Pl.'s Mot. 4. But the fact that Dr. Mankani may not have analyzed "the effect, if any, [Jennings's] condition may have on his ability to perform the job in question," *see Keith*, 703 F.3d at 923, does not render Dow Corning's subsequent conduct unlawful. As the court in *Keith* made clear, "[t]he ADA requires *employers*

to act . . . based on the actual disability and the effect that disability has on the particular individual's ability to perform the job." *Id*. (emphasis added). And here, Dow Corning assessed the effect Jennings's ailments would have on his ability to do the LPO job before it rescinded his offer of employment.

After he evaluated Jennings, Dr. Mankani reported the resulting medical restrictions to Dow Corning's Human Resources Department, including Midland Plant HR Manager Elizabeth Stokes. Ms. Stokes reviewed Dr. Mankani's medical restrictions, compared them with the essential functions of the LPO position, and determined that the stated restrictions precluded Jennings from performing the essential functions of the LPO position. Stokes Aff. ¶ 9, *attached as* Def.'s Mot. Summ. J. Ex. 4. Notably, Dow Corning determined that Jennings could not safely respond to emergency situations or perform the heavy-exertion tasks required of an LPO during emergency response operations, potentially placing both Jennings and others in jeopardy. Moreover, Jennings agrees that under Dr. Mankani's restrictions, he could not do the job. *See* Pl.'s Dep. 118. Thus, Dow Corning rescinded Jennings's conditional offer of employment only after his ability to perform the job, based on his actual impairments, had been properly assessed. Jennings's claim that Dow Corning "failed to perform an individualized inquiry to determine what impact [Jennings's] back-pain report to his chriporactor would have on his ability to perform the essential functions of a Loss Prevention Officer," Pl.'s Mot. 1, is incorrect.

**B**

Jennings takes issue with other points of the Court's opinion as well. He contends that "[t]he Court implies that Dr. Mankani considered the results" of the physical examination conducted by Ms. Chronowski, but "there is no evidence of that whatsoever." *Id*. at 4. Jennings is once again mistaken. In his motion, he acknowledges that "Dr. Mankani talked to the PA who


performed the assessment[.]" Pl.'s Mot. 2. Further, the unrebutted evidence established that Dr. Mankani sat down with Ms. Chronowski to discuss her report, Jennings's medical records, and "what the outcome should be." Mankani Dep. 9, *attached as* Def.'s Mot. Summ. J. Ex. 2. Dr. Mankani testified that his review included Ms. Chronowski's physical examination findings, Jennings's medical test results, and a complete, up-to-date medical history. Mankani Aff. ¶ 3, *attached as* Def.'s Mot. Summ. J. Ex. 5. Thus, Jennings's assertion that there is "no evidence" of Dr. Mankani conferring with Ms. Chronowski is incorrect. He offers nothing to demonstrate this factual issue is in dispute.

Jennings also argues that the Court "allows an individual inquiry to be determined based on chiropractic records that were never confirmed." Pl.'s Mot. 5. This is not accurate—Jennings confirmed the accuracy of the chiropractor reports during his deposition. Pl.'s Dep. 99 ("I have no reason to doubt that they recorded the information accurately."). This argument is also without merit.

Finally, Jennings contends that the Court's opinion "fails to acknowledge that [Dow Corning] all but admitted that the fear of future shoulder injury was the basis for half of the restrictions." Pl.'s Mot. 5. He continues, "[t]he shoulder injury, recovery, and Defendant's speculation about a retear are not mentioned in the opinion." *Id*. But they were. Indeed, the Court discussed Jennings's shoulder injury, his surgery and subsequent recovery, and his continued residual deficits following therapy. *See* May 10, 2013 Op. & Order 6–7. That Dr. Mankani obtained every record concerning Jennings's "2010 shoulder surgery" before rending his opinion was also noted. *Id*. at 17. The Court concluded that the restrictions concerning Jennings's shoulder were reasonable given Dr. Mankani's expertise and the fact that "it doesn't matter how the surgery is done, if it's a full thickness tear, the retear rate is significant."

Mankani Dep. 21; *see also* Peppler Dep. 22, *attached as* Def.'s Resp. Summ. J. Ex. 2 ("there would still remain . . . that increased probability of a recurrence of injury at that shoulder site."). Because even Jennings's expert (Dr. Craig Peppler) acknowledged his shoulder injury increased the possibility of a future injury, Dr. Mankani's work-restrictions were reasonable to keep Jennings safe on the job. Dow Corning's reliance on those restrictions to determine Jennings could not safely act as an LPO did not violate the ADA.

### III

Accordingly, it is **ORDERED** that Jennings's motion for reconsideration, ECF No. 29, is **DENIED**.

Dated: July 11, 2013                                   s/Thomas L. Ludington
                                                      THOMAS L. LUDINGTON
                                                      United States District Judge

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 11, 2013.

                              s/Tracy A. Jacobs
                              TRACY A. JACOBS